IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **JACEK JABLONSKI**<br>7403 Wurzbach Road<br>Apt. 424<br>San Antonio, Texas 78229<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>**BELOIT HEALTH SYSTEM, INC.**<br>Registered Agent: Rodney Kimes<br>542 East Grand Avenue<br>Beloit, Wisconsin 53511<br><br>　　　　Defendant. | Case No.:  20-cv-886<br>EEOC Case No. 26G201901245C<br><br>JURY TRIAL DEMANDED |

# COMPLAINT

Plaintiff, Jacek Jablonski ("Dr. Jablonski"), through his attorneys, Hawks Quindel, S.C., by Danielle M. Schroder, for his Complaint against Defendant, Beloit Health System, Inc. ("BHS"), states and alleges as follows:

## SUMMARY OF CLAIMS

Plaintiff asserts Defendant discriminated against him in the terms, conditions, and compensation of his employment on the basis of his national origin and terminated his employment on the basis of his national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),  42 U.S.C. § 2000e-2 *et seq.* Plaintiff further asserts Defendant discriminated against him on the basis of disability, refused to accommodate Plaintiff's disability, and terminated Plaintiff's

employment because of disability, all of which constitute violations of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101, *et seq.*

## PARTIES

1. Dr. Jacek Jablonski is an adult legal resident in the United States. He is of Polish ancestry and national origin and holds dual citizenship in Poland and the United Kingdom. He has a number of disabilities, including obstructive sleep apnea, obesity, insomnia, sleep deprivation, metabolic syndrome, pain syndrome, and chronic venous insufficiency in his lower extremities.

2. Dr. Jablonski was employed as a general and cardiothoracic anesthesiologist at Beloit Health System, Inc. from November 1, 2018, to May 1, 2019, when BHS terminated his employment.

3. Beloit Health System, Inc. is a healthcare provider incorporated under the laws of Wisconsin with a principal place of business at 1969 West Hart Road, Beloit, Wisconsin 53511. On information and belief, BHS employs more than 500 employees.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this matter pursuant to 42 U.S.C. §§ 2000e-5(f)(3) and 12117(a) because it is brought under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendments Act of 2008 as well as pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

5. Venue is proper in the Western District of Wisconsin pursuant to 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein were committed in this district and pursuant to 28 U.S.C. § 1391 because the substantial part of the events or omissions giving rise to the claims occurred in the district.

## PROCEDURAL HISTORY AND ADMINISTRATIVE EXHAUSTION

6. Dr. Jablonski filed a timely discrimination complaint with the Wisconsin Department of Workforce Development Equal Rights Division ("ERD") and the Federal Equal Employment Opportunities Commission ("EEOC") on August 27, 2019, within 300 days of when the unlawful employment practices alleged herein occurred.

7. On March 27, 2020, an Equal Rights Officer of the ERD issued an Initial Determination – No Probable Cause/Probable Cause. The Equal Rights Officer found there was no probable cause to believe that BHS violated the Wisconsin Fair Employment Law by discriminating against Dr. Jablonski in the terms and conditions of employment and in compensation because of disability, national origin, or ancestry, or in terminating his employment because of national origin or ancestry. However, the Equal Rights Officer found there was probable cause to believe BHS violated the Wisconsin Fair Employment Law by (a) refusing to reasonably accommodate a disability and (b) terminating the employment of Dr. Jablonski because of disability.

8. On April 23, 2020, Dr. Jablonski appealed the following no probable cause findings: (1) Discriminating against the Complainant in the terms and conditions of employment because of national origin/ancestry; (2) Discrimination against the Complainant in compensation because of national origin/ancestry; and (3) Terminating the employment of the Complainant because of national origin/ancestry.

9. On April 28, 2020, the ERD certified the case for a hearing on the issue of probable cause.

10. On July 1, 2020, the EEOC issued Dr. Jablonski a Notice of Right to Sue. Having received the Notice on the same date as its issuance, Dr. Jablonski files this action within 90 days of the date of his receipt of the Notice. A true and correct copy of the Notice of Right to Sue is attached as Exhibit A.

## FACTUAL ALLEGATIONS

11. BHS hired Dr. Jablonski to work as a general and cardiothoracic anesthesiologist on November 1, 2018, subject to the terms of a physician employment contract and an H1-B visa sponsored by BHS.

12. Dr. Jablonski, who maintained licensure to practice medicine in both Wisconsin and Illinois, joined the staff at BHS after years of providing medical care in his native Poland and in Great Britain, where he completed his fellowship training.

13. Upon hire, Dr. Jablonski had the acceptable equivalent certification from the European Union as an American Board Certified Anesthesiologist.

14. Dr. Jablonski graduated with distinction with a medical degree from the Medical University of Warsaw in June 2000 and completed a four-year residency in anesthesiology at John H. Stroger Jr. Hospital in Chicago, Illinois. He then completed fellowships in cardiothoracic anesthesiology at the Royal Wolverhampton Hospitals (03/2012 – 09/2013), Oxford University Hospitals (10/2013 – 08/2014), Royal Brompton and Harefield Hospital (08/2014 – 10/2015) and Basildon University Hospital (08/2016 – 01//2017).

15. In 2014, Dr. Jablonski passed the European Association of Cardiothoracic Anesthetists examination in perioperative transeosophageal echocardiography.

16. In 2016, Dr. Jablonski became a certified specialist physician in anesthesiology and critical care medicine in the European Union. This is the equivalent of board certification in the United States.

17. When BHS hired Dr. Jablonski, he was required to provide his medical history to BHS, go through a physical, and undergo a blood test. Thus, when BHS hired Dr. Jablonski, it was aware of his disabilities of obstructive sleep apnea and obesity.

18. From the outset of his employment, Dr. Jablonski was subjected to an unprofessional work environment and disparate treatment because of his national origin and disability.

19. When BHS petitioned for Dr. Jablonski's H-1B visa, it represented his compensation would be "no less than $330,000.00 per year, plus customary fringe

benefits offered to all similarly situated employees of our organization." It further represented Dr. Jablonski's schedule would be 32 hours per week at Beloit Hospital and 32 hours per week at Beloit Health System – NorthPointe Health and Wellness Campus.

20. Dr. Jablonski's employment contract explicitly stated that his compensation, commencing as of November 1, 2018, would be "the greater of three hundred and thirty thousand dollars ($330,000) per year." There are no qualifiers, as it relates to benefits or otherwise, for this compensation. All compensation was "to be paid in accordance of the current payroll procedures."

21. Dr. Jablonski's employment contract also addressed fringe benefits as follows: "As additional compensation for providing Physician Services, the System shall provide Physician with the employee welfare and retirement benefits offered by the System from time to time. These benefits are subject to modification or termination, provided the changes are applicable to other similarly situated physician employees of the System."

22. After he moved to the United States and commenced his employment, BHS reduced Dr. Jablonski's compensation to $265,000 per year, *i.e.*, $65,000 less than the parties had agreed upon per the terms of their contract. Having practically no other option, Dr. Jablonski conceded the ultimatum under pressure.

23. Dr. Jablonski then, having had exhausted organizational means of appeal within the BHS, complained to BHS's immigration attorney regarding his reduced salary based on the fact that the reduction was an illegal breach of the

conditions of his employment under the H-1B visa approved by the US Citizenship and Immigration Services. After that, BHS reversed course and reluctantly returned his salary to $330,000 per year.

24. BHS's reduction of Dr. Jablonski's salary was discriminatory and because of his national origin.

25. BHS also failed to enroll Dr. Jablonski in its employee benefit programs upon hire. While it had Dr. Jablonski complete a Group Insurance Enrollment Form for short-term disability insurance, BHS failed to give Dr. Jablonski the necessary information regarding the remainder of available employee benefits.

26. In fact, BHS claimed that specifically *because* Dr. Jablonski did not elect employee benefits, his salary would be reduced from $330,000 to $265,000.

27. BHS's allegation that Dr. Jablonski was only entitled to a salary of $330,000 per year if he elected benefits – which BHS failed to provide to him – was false and discriminatory.

28. BHS enrolled Dr. Jablonski in life insurance in February 2019. Dr. Jablonski did not receive medical, dental, or vision coverage until April 2019, after he presented to a doctor and realized he was without coverage.

29. BHS failed to provide Dr. Jablonski with the employee welfare and retirement benefits which BHS offered to other similarly situated BHS physician employees; such action was discriminatory.

30. Aside from Dr. Jablonski, each anesthesiologist at BHS was employed through the third-party entity, Stateline Anesthesiologists ("the Group").

Even though BHS petitioned for Dr. Jablonski's H-1B visa as his exclusive employer, BHS functionally treated Dr. Jablonski as an employee of the Group. When Dr. Jablonski interviewed for his position, BHS informed him that his supervisors were Dr. Jimson C. Tse and Dr. Hajera F. Taher, both Stateline employees. Dr. Taher, the Chair of the Anesthesiology Department, was assigned as Dr. Jablonski's mentor. At hire, BHS explicitly explained to Dr. Jablonski that he would report to the Group even though formally he was an employee of BHS. In practice, Dr. Jablonski was incorporated into the Group and was required to follow their procedures, including their practices regarding scheduling and vacation time.

31. Notwithstanding Dr. Jablonski's functional incorporation into the Group, BHS treated Dr. Jablonski differently and less favorably than the other anesthesiologists. For instance, Dr. Jablonski had less vacation time, he had less discretion to use his vacation time, he had less discretion in his job responsibilities, he had to report his absences directly to Vice President/Chief Nursing Officer, Sharon Cox, DNP, MSN, RN, and he had to work more hours.

32. Further, despite BHS' representation on Dr. Jablonki's H-1B paperwork, Dr. Jablonski never worked at the NorthPointe Health and Wellness Campus, a location where the work demands were less rigorous.

33. When Dr. Jablonski was hired, BHS represented he was entitled to six weeks of vacation. In the spring of 2019, Ms. Cox notified Dr. Jablonski that he was only entitled to four (4) weeks. Nevertheless, when Dr. Jablonski attempted to use vacation days, BHS told him that his vacation requests were denied.

34. BHS' disparate treatment of Dr. Jablonski with respect to his vacation time and use of the same was discriminatory.

35. Dr. Jablonski was targeted and treated inferiorly to his colleagues as a result of his national origin and disability.

36. Dr. Tse, a member of the anesthesiology group to whom Dr. Jablonski reported, told Dr. Jablonski that this was "not like Great Britain," and he made note that people from Hong Kong do not like the British. Dr. Tse is from Hong Kong.

37. On another occasion, Dr. Jablonski requested to take off of work on Christmas day. BHS denied Dr. Jablonski's request notwithstanding, upon information and belief, other practitioners are permitted to use vacation days for a religious holiday.

38. BHS' expectation and requirements regarding Dr. Jablonski's work hours were different than similarly situated employees, and therefore discriminatory.

39. Within Dr. Jablonski's first month of employment, two anesthesiologists were permitted to take vacation in November and December, 2018, a very busy season at the hospital. These temporary departures led to an even grossly more significant staffing shortage which BHS expected Dr. Jablonski to manage.

40. Due to the staffing shortage, BHS forced Dr. Jablonski to work an exorbitant number of hours. He worked 100 hours during a one-week time period. On one occasion, Dr. Jablonski worked 36 hours straight. While BHS permitted other anesthesiologists to take time off, the organization failed to provide support to

Dr. Jablonski in managing his workload. Rather, when Dr. Jablonski raised the issue with BHS, Ms. Cox told Dr. Jablonski that his work hours were "unlimited."

41. Dr. Jablonski informed BHS that the increased workload was affecting his health and wellbeing.

42. Dr. Jablonski reached out to Dr. Tse to discuss a reasonable schedule, approximately 80 hours of service per week. Dr. Tse explained that scheduling "doesn't work that way," and when Dr. Jablonski suggested it was illegal for him to work more than 64 hours per week, Dr. Tse replied "u think this is an office job."

43. Due to Dr. Jablonski's workload and extensive hours, Dr. Jablonski was having difficulty sleeping and experiencing pain in his legs which made achieving his work duties difficult. In fact, Dr. Jablonski was diagnosed with severe insomnia with profound sleep deprivation, morbid obesity, which resulted in new onset Type 2 diabetes mellitus, severe hypertension, and metabolic syndrome. He was further diagnosed with pain syndrome, cellulitis, and exacerbated chronic venous insufficiency in his lower extremities. All of these conditions resulted from BHS' exploitation of him.

44. By April 2019, Dr. Jablonski's treating physician recommended that he assume a medical leave of absence in order to treat his various impairments.

45. Specifically, on April 8, 2019, Dr. Jablonski called in sick to the hospital indicating he needed a medical leave of absence. He called in sick the following day as well.

46. Notwithstanding Dr. Jablonski's notice of his absences, BHS sent the police to Dr. Jablonski's residence on April 9, 2019.

47. Furthermore, when Dr. Jablonski attempted to seek medical treatment with BHS on April 8, 2019 and April 10, 2019, he was told he did not have health insurance coverage despite BHS' previous representations that benefits, including health insurance, were part of his employment package.

48. Realizing he did not have health insurance, on April 10, 2019, Dr. Jablonski texted Ms. Cox requesting his health insurance certificate, which was overdue by more than five months. Ms. Cox alleged BHS previously provided him with the requisite information, which was untrue.

49. On April 10, 2019, Dr. Jablonski notified Dr. Tse, Dr. Taher and Ms. Cox that he would not be coming into work because he was ill.

50. On April 11, 2019, Dr. Jablonski texted Ms. Cox to inform her in writing that he was on a medical leave of absence until April 19, 2019.

51. On April 12, 2019, Dr. Jablonski provided a medical certification to BHS, confirming his need for medical leave of absence from April 8, 2019 to April 19, 2019.

52. Ms. Cox emailed Dr. Jablonski on April 12, 2019 and April 16, 2019 to request that he meet with her on April 22, 2019. Dr. Jablonski informed Ms. Cox that he could not confirm the date of his return to work because he was still ill.

53. On April 30, 2019, Dr. Jablonski presented BHS with a second medical certification indicating that he needed a prolonged medical leave of absence through May 24, 2019.

54. Dr. Jablonski sought a medical leave of absence to accommodate his disabilities.

55. BHS refused to accommodate Dr. Jablonski's medical leave. Instead, BHS terminated Dr. Jablonski's employment on May 1, 2019.

56. Prior to his termination, BHS did not request additional medical documentation to corroborate or further explain his need for a medical leave aside from the medical certifications, which Dr. Jablonski had provided previously.

57. BHS did not engage in the interactive process in an attempt to accommodate Dr. Jablonski.

58. Dr. Jablonski's short-term medical leave was not an undue hardship.

59. BHS allegedly terminated Dr. Jablonski's employment for the reasons articulated in its termination letter: he allegedly failed to satisfy the obligations of his Physician Employment Agreement, "namely sections 3.1.2 (failed to obtain board eligibility); 3.3.1 (failed to comply with system policies regarding call off, scheduling, and other rules); 3.3.3 (failed to comply with directives and instructions); 3.3.5 (engaged in conduct which is disruptive and unprofessional); and 3.5 (failed to cooperate with the System's quality of care and other standards)."

60. BHS did not elaborate on the reasons for Dr. Jablonski's termination aside from the information contained in the termination letter.

61. At the time of his termination, Dr. Jablonski was a fully licensed anesthesiologist and remained eligible to practice anesthesiology at BHS. He had complied with BHS and The Group's policies regarding time off and scheduling,

he had complied with directives and instructions, he had remained professional and he had complied with BHS' quality of care standards.

62. Prior to his termination, BHS had not issued any written warnings or implemented discipline of Dr. Jablonski relating to any of the allegations in the termination letter or otherwise.

63. On information and belief, BHS terminated Dr. Jablonski because of his disability and his request for a medical leave of absence.

64. On further information and belief, BHS's termination of Dr. Jablonski was due, at least in part, to his national origin. Similarly-situated employees from the United States would not have been terminated when they called in sick and required a medical leave of absence.

65. As a result of BHS's discriminatory actions, Dr. Jablonski has sustained significant damages, including but not limited to lost wages, medical expenses, physical illness, and emotional distress.

**FIRST CAUSE OF ACTION: DISPARATE TREATMENT (TERMS AND CONDITIONS) ON THE BASIS OF PLAINTIFF'S NATIONAL ORIGIN IN VIOLATION OF HIS RIGHTS AS GUARANTEED BY TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

66. Dr. Jablonski realleges and incorporates the allegations contain in paragraphs 1-65 above.

67. BHS violated 42 U.S.C. § 2000e-2(a) when it intentionally discriminated against Dr. Jablonski with respect to his terms, conditions, or privileges of employment because of his national origin.

68. BHS engaged in this discriminatory practice with malice or with reckless indifference to Dr. Jablonski's federally protected rights under Title VII of the Civil Rights Act of 1964.

69. Dr. Jablonski has experienced harm, suffered injuries and incurred damages as a result of Defendant's discrimination against him on the basis of his national origin.

### SECOND CAUSE OF ACTION: DISPARATE TREATMENT (COMPENSATION) ON THE BASIS OF PLAINTIFF'S NATIONAL ORIGIN IN VIOLATION OF HIS RIGHTS AS GUARANTEED BY TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

70. Dr. Jablonski realleges and incorporates the allegations contain in paragraphs 1-69 above.

71. BHS violated 42 U.S.C. § 2000e-2(a) when it intentionally discriminated against Dr. Jablonski with respect to his compensation because of his national origin.

72. BHS engaged in this discriminatory practice with malice or with reckless indifference to Dr. Jablonski's federally protected rights under Title VII of the Civil Rights Act of 1964.

73. Dr. Jablonski has experienced harm, suffered injuries, and incurred damages as a result of Defendant's discrimination against him on the basis of his national origin.

### THIRD CAUSE OF ACTION: DISPARATE TREATMENT (TERMINATION) ON THE BASIS OF PLAINTIFF'S NATIONAL ORIGIN IN VIOLATION OF HIS RIGHTS AS GUARANTEED BY TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

74. Dr. Jablonski realleges and incorporates the allegations contain in paragraphs 1-73 above.

75. BHS violated 42 U.S.C. § 2000e-2(a) when it discharged Dr. Jablonski because of his national origin.

76. BHS engaged in this discriminatory practice with malice or with reckless indifference to Dr. Jablonski's federally protected rights under Title VII of the Civil Rights Act of 1964.

77. Dr. Jablonski has experienced harm, suffered injuries, and incurred damages as a result of Defendant's discrimination against him on the basis of his national origin.

**FOURTH CAUSE OF ACTION: FAILURE TO ACCOMMODATE PLAINTIFF'S DISABILITY IN VIOLATION OF HIS RIGHTS AS GUARANTEED BY THE AMERICANS WITH DISABILITIES ACT OF 1990 AND ITS AMENDMENTS**

78. Dr. Jablonski realleges and incorporates the allegations contain in paragraphs 1-77 above.

79. The ADA prohibits an employer's failure to reasonably accommodate the known physical or mental limitations of an otherwise qualified employee with a disability, unless the employer shows that the accommodation would impose an undue hardship on the operation of its business. 42 U.S.C. § 12112(b)(5)(A).

80. Dr. Jablonski's obstructive sleep apnea, obesity, insomnia, sleep deprivation, metabolic syndrome, pain syndrome, cellulitis, and chronic venous insufficiency are disabilities as defined by § 12102 of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act, Amendments Act of 2008.

81. BHS violated 42 U.S.C. § 12112(a) when it discriminated against Dr. Jablonski on the basis of disability in regard to the terms, conditions, and

privileges of employment by failing to make reasonable accommodations to his disabilities and by calling the police on Dr. Jablonski when he needed a medical leave of absence as an accommodation.

82. BHS failed to engage in good faith efforts to consult with Dr. Jablonski to identify and make a reasonable accommodation.

83. Dr. Jablonski's short-term medical leave did not impose an undue hardship on BHS.

84. BHS engaged in this discriminatory practice with malice or with reckless indifference to Dr. Jablonski's federally protected rights under the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendments Act of 2008.

85. Dr. Jablonski has experienced harm, suffered injuries, and incurred damages as a result of Defendant's discrimination against him on the basis of his disability.

**FIFTH CAUSE OF ACTION: TERMINATION OF PLAINTIFF ON THE BASIS OF HIS DISABILITY IN VIOLATION OF HIS RIGHTS AS GUARANTEED BY THE AMERICANS WITH DISABILITIES ACT OF 1990 AND ITS AMENDMENTS**

86. Dr. Jablonski realleges and incorporates the allegations contain in paragraphs 1-85 above.

87. The ADA prohibits an employer from terminating an otherwise qualified employee on the basis of their disability or their request for accommodation of the same. 42 U.S.C. § 12112.

88. Dr. Jablonski's obstructive sleep apnea, obesity, insomnia, sleep deprivation, metabolic syndrome, pain syndrome, cellulitis, and chronic venous

insufficiency are disabilities as defined by § 12102 of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act, Amendments Act of 2008.

89. BHS violated 42 U.S.C. § 12112(a) when it discriminated against Dr. Jablonski on the basis of disability with regard to the discharge of his employment.

90. BHS failed to engage in good faith efforts to consult with Dr. Jablonski to identify and make a reasonable accommodation that would have allowed him to continue in his position and would not have caused undue hardship on BHS.

91. BHS engaged in this discriminatory practice with malice or with reckless indifference to Dr. Jablonski's federally protected rights under the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendments Act of 2008.

92. Dr. Jablonski has experienced harm, suffered injuries, and incurred damages as a result of Defendant's discrimination against him on the basis of his disability.

## DEMAND FOR RELIEF

Plaintiff, Jacek Jablonski, demands judgment against Defendant, awarding him:

A. Back pay and all other compensation, including interest and benefits;

B. Compensatory damages for past and future losses resulting from the unlawful employment practices, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation;

C.  Punitive damages for the BHS's malicious and reckless indifference described above;

D.  Pre- and post-judgment interest;

E.  An award of reasonable attorney's fees and costs related to the action;

F.  Any other equitable relief the Court deems appropriate.

## JURY DEMAND

Plaintiff respectfully requests a jury trial on all questions of fact and law raised by his complaint.

Dated: September 23, 2020.

### HAWKS QUINDEL, S.C.

By:   */s/ Danielle M. Schroder*

Danielle M. Schroder, State Bar No. 1079870
Email: dschroder@hq-law.com
409 East Main Street
P.O. Box 2155
Madison, Wisconsin 53701-2155
Telephone: 608/257-0040
Facsimile: 608/256-0236

Attorney for Plaintiff, Jacek Jablonski