IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JACEK JABLONSKI,

                                    Plaintiff,                          OPINION AND ORDER

          v.
                                                                        20-cv-886-wmc

BELOIT HEALTH SYSTEM, INC.,

                                    Defendant.

          Plaintiff Jacek Jablonski asserts claims against his former employer Beloit Health

System, Inc., for (1) discrimination based on national origin in violation of Title VII, 42

U.S.C. § 2000e-2(a)(1); and (2) failure to accommodate and unlawful termination in

violation of the Americans with Disability Act, 42 U.S.C. § 12112(a).  Before the court is

defendant's motion for summary judgment on all claims.  (Dkt. #34.)  Because plaintiff

has failed to respond with sufficient evidence to permit a reasonable jury to find in his

favor on any of his claims, the court will grant summary judgment to defendant and direct

entry of final judgment in its favor.


                              UNDISPUTED FACTS[1]

**A.  Overview of Plaintiff**

          Jacek Jablonski is of Polish national origin and decent, as well as a British citizen.[2]

Jablonski obtained his degree in medicine from the Medical University of Warsaw,

---

[1] Unless otherwise noted, the court finds the following facts undisputed and material when viewed in the light most favorable to plaintiff as the non-moving party.

[2] Defendant does not dispute that Jablonski is of British citizenship, but points out that Title VII does not encompass discrimination based on citizenship or immigration status, making Jablonski's British citizenship of no materiality to his claims.  *See Cortezano v. Salin Bank & Tr. Co.*, 680 F.3d

completed a four-year residency at John H. Stroger Jr. Hospital in Chicago, Illinois, and completed fellowships in cardiothoracic anesthesiology at the Royal Wolverhampton Hospitals, Oxford University Hospitals, and Basildon University Hospital. In 2016, Jablonski also achieved certification from the Polish government that is equivalent to, or exceeds, board certification in the United States. Under that certification, Jablonski is recognized as a "Specialist" in the fields of Anesthesiology and Intensive Care.

### B. Overview of Defendant and Other Key Actors

Defendant Beloit Health System, Inc. ("BHS") is an integrated health system dedicated to providing primary and specialty care to patients in the Beloit region, a "state-line" community covering the area near or on the border of Wisconsin and Illinois in the vicinity of Beloit. As such, BHS is the parent company for a range of health care providers, including Beloit Hospital and Beloit Clinic, and employs approximately 1,600 individuals, including physicians. BHS also contracts with third-party, independent physicians and physician groups to provide clinical services at Beloit Hospital and other locations within its integrated health system. All physicians who provide services in or under the auspices of BHS, whether physicians employed by BHS or contract physicians, must be privileged by the applicable Medical Board and a member of its medical staff. As such, BHS does not exercise employment authority over contract physicians, even if considered a staff member.

---

936, 940 (7th Cir. 2012) ("[N]ational origin discrimination as defined in Title VII encompasses discrimination based on one's ancestry, but not discrimination based on citizenship or immigration status.").

Roger Kapoor, M.D., is Vice President and Chief Medical Officer ("CMO") at BHS. As CMO, he is responsible for overseeing the practice of medicine, promoting quality medical care, and serving as a liaison to the medical staff.  Between January 1, 2018, and December 31, 2019, Kapoor also supervised physician-employees.  Sharon Cox, D.N.P., is Vice President and Chief Nursing Officer ("CNO") at BHS, responsible for overseeing the nursing practice, physician-employees and contracted physicians who work in the fields of anesthesia and emergency medicine.  In her capacity as CNO, defendant maintains that Cox also supervised two physician-employees, one being Jablonski.

At the same time, plaintiff contends that he was "managed" by BHS's Anesthesiology Department, led by Drs. Hajera Taher and Jimson Tse.  Plaintiff further points out that Cox neither set his compensation, nor made the decision to terminate his employment.  Moreover, plaintiff contends that Cox did not inform him until April 2019 that she had been assigned by BHS to supervise his employment or that he had to seek her approval for absences.  Even so, there appears no dispute that as CMO, Kapoor had ultimate management responsibility over Jablonski and all others who practice medicine at BHS, although there is no indication that he was personally involved in supervising Jablonski's actual employment.

In addition to Vice Presidents Kapoor and Cox, Timothy McKevett is BHS's President and Chief Executive Officer, and Thomas McCawley is the Vice President of Non-Clinical Operations, including Human Resources.  These four individuals comprised members of the so-called "Administrative Team" during the period relevant to plaintiff's claims.

BHS maintains an anesthesiology service line at the Beloit Hospital and at the day surgery center on the NorthPointe Health and Wellness Campus in Roscoe, Illinois ("NorthPointe").  To provide anesthesia services at NorthPointe, BHS is required to obtain proper credentialing through SwedishAmerican, a third-party partner of BHS.  In turn, SwedishAmerican requires anesthesiologists who practice at one of its facilities to obtain board certification from the American Board of Anesthesiology ("ABA").

Finally, Stateline Anesthesiologists, S.C., is a third-party, Wisconsin service corporation that employs physicians who are qualified and licensed to practice medicine in the State of Wisconsin, specializing in anesthesiology.  Stateline exclusively provides anesthesiology services at the Hospital and NorthPointe on an independent contractor basis under the terms of its December 17, 2015, agreement with BHS.  Stateline physicians are not employees of BHS, but like all other physicians contracted by BHS, they are members of its medical staff.[3]

---

[3] Plaintiff purports to dispute this fact and others on the basis that "the material cited to support this fact cannot be presented in a form that would be admissible in evidence," but plaintiff fails to explain *why* the testimony in the cited deposition and statements in the declarations would not be admissible except to cite a lack of personal knowledge under Fed. R. Evid. 602.  (Pl.'s Resp. to Def.'s PFOFs (dkt. #48) ¶ 25.)  However, he fails to suggest (much less explain) why two of BHS's vice presidents, one ultimately in charge of all anesthesiologists, employed or contracted, and the other in charge of all human resources, Cox and McCawley, *and* two Stateline anesthesiologists would *not* have personal knowledge of the contractual relationship between Stateline physicians and BHS. Accordingly, the court will accept this fact as proven, at least for purposes of summary judgment. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (describing summary judgment as the "proverbial put up or shut up" phase of a case, "when a party must show what evidence it has that would convince a trier of fact to accept its version of events").

## C. Recruitment of Dr. Jablonski

In the spring and summer of 2018, BHS coordinated with Stateline to recruit a new surgical anesthesiologist.  In advance of posting the position, the two entities had yet to determine which entity would actually employ the anesthesiologist.  While BHS's physician recruiter, Claudine Taub, posted the job opening for the position, a former Stateline employee, Dr. Tania Balabanova, who completed her residency in anesthesiology with Jacek Jablonski, recommended him for the position.  Taub then contacted Jablonski directly about the posted position via telephone in March 2018.

In that initial conversation, Taub and Jablonski discussed his educational credentials and, specifically, his board certification status.  Taub advised Jablonski that BHS would not accept his European credentials, to which Jablonski responded that he would initiate his board certification process through the ABA immediately.  While Jablonski does not dispute having this conversation with Taub, he nevertheless avers that BHS represented at the beginning of his employment that it *would* accept his European credentials, although he was also expected to work toward obtaining his ABA board certification.[4]

Based on this call and the recommendation of Dr. Balabanova, BHS invited Jablonski to a group interview in Beloit on June 5-6, 2018, with employees of both BHS and Stateline.  None of the members of BHS's Administrative Team participated or otherwise met Jablonski as part of his initial trip to Beloit.  Jablonski avers that during his

---

[4] In addition to talking with Taub, Jablonski spoke with Dr. Tse, a Stateline anesthesiologist, during the recruitment process.  However, neither side appears to suggest that discussion is material to this lawsuit.

group interview, he acknowledged not being ABA board certified but explained that he had the acceptable equivalent in the European Union.  Following the interview, the Stateline physicians recommended Jablonski to BHS based on his credentials and their belief that he would be a good fit.  Similarly, BHS employees who had met with him recommended Jablonski to President McKevett and Vice President and CNO Cox on the same basis.

Jablonski, who is not a citizen or permanent resident of the United States, required an H-1B visa to work in the United States.  Because Stateline is not able to sponsor H-1B visa holders and BHS is, Stateline and BHS agreed that BHS would employ Jablonski.  Plaintiff points out, and defendant does not dispute, that this was a unique arrangement.  Indeed, for the last 27 plus years, all other anesthesiologists performing services at BHS were employees of Stateline.  In consultation with Cox and based on the above-mentioned recommendations, President McKevett authorized Jablonski's hiring as a BHS employee.

Taub communicated an offer of employment to Jablonski in a phone call in June 2018.  Among other things, Taub specifically explained that BHS would be his employer and Jablonski verbalized his understanding.  BHS then memorialized the terms and conditions of his employment in a Physician Employment Agreement.  (Mitchell Decl., Ex. 4 (dkt. #44-4).)  In Section 3, among other duties, the Agreement imposed obligations on Jablonski with respect to board eligibility, conduct and cooperation.  The Agreement also stated that BHS could terminate Jablonski's employment immediately should he fail to satisfy the obligations set forth in Section 3.

The Agreement attached two exhibits:  Exhibit A contained physician-specific information; Exhibit B listed his compensation for the three-year period running from

November 1, 2018, through October 31, 2021, as $330,000 per year.  (*Id.* at 14.)  In addition to this annual compensation, Section 2.2 of the Agreement, titled "Fringe Benefits," included "[a]s additional compensation for providing Physician Services, . . . employee welfare and retirement benefits offered by [BHS] from time to time."  (*Id.* at 4.)  On June 20, 2018, McKevett signed the Agreement and on August 6, 2018, Jablonski signed it.[5]

### D. Jablonski's Employment

#### 1.  Compensation and Voluntary Benefits Dispute

Jablonski began his employment with BHS as a full-time surgical anesthesiologist on November 1, 2018.  Before starting his employment, BHS's recruiter Taub met with Jablonski in person at the Hospital on October 29 to give him an orientation schedule and review his benefits.  As to the latter, Taub gave Jablonski a hard copy of the list of benefits for him to keep, as well as reviewed the document with him.  She specifically explained that benefit program was voluntary, meaning that BHS would not enroll him in any set of benefits.  Taub also avers that she instructed him to self-enroll and directed him to contact BHS's Benefits Coordinator, Theresa Albrecht, if he had any questions.  Nevertheless,

---

[5] Defendant proposes a number of additional facts concerning the H1-B visa process, which neither appear material to plaintiff's claims nor to defendant's stated bases for summary judgment.  (Def.'s PFOFs (dkt. #36) ¶¶ 52-65.)  At most, the proposed findings would be material to whether the individuals implicated in his discrimination claims were aware of his national origin or otherwise involved in the H1-B visa application process.  Regardless, plaintiff separately avers that at least some of the individuals were aware of his national origin.  (*See, e.g.*, Pl.'s Resp. to Def.'s PFOFs (dkt. #48) ¶ 61 (Jablonski representing that his being Polish came up in casual conversations with colleagues in the Anesthesiology Department during the course of his employment).)

Jablonski avers that he was given no instructions on how to self-enroll at that time, representing instead that he did not receive enrollment instructions until April 2019.[6]

Benefits Coordinator Albrecht also avers that all new physician-employees attend an "onboarding meeting" with her during their first day of work for approximately one hour.  During that meeting, Albrecht's practice is to review the standard employment and benefits forms, and in 2018, to instruct physician-employees to self-enroll in the voluntary benefits packages through BHS's third-party vendor, HR Connection.  For short-term disability benefits in particular, employees were required to complete a paper form. Albrecht conducted Jablonski's new physician onboarding meeting at 1:30 p.m. on November 1, 2018, during which Jablonski signed some forms, including the Condition of Employment Agreement.  Albrecht specifically avers that she instructed Jablonski on how to self-enroll online in volunteer benefit packages; Jablonski again disputes that he received instructions on how to self-enroll.  Specifically, Jablonski avers that he never received an email with an enrollment link from HR Connection, supposedly because Albrecht was under the impression that he did not want benefits.

Jablonski was further required to attend a new employee orientation, which Albrecht also conducted.  Based on his hire date, the next available orientation would have been held on December 3, 2018, but Jablonski was not available to attend due to work obligations.   In fact, Jablonski represents that he was "forbidden" to attend that

---

[6] Taub also avers that she had multiple, follow-up phone conversations with Jablonski in July 2018 about benefits, during which she again told him that the benefits were voluntary, and he would need to self-enroll.  Still, Jablonski disputes that he was provided instructions on how to self-enroll until April 2019.

orientation.  (Jablonski Decl. (dkt. #50) ¶ 16.)  Instead, he attended the January 7, 2019, orientation.   During the January 2019 orientation, Albrecht presented an employee benefits Power Point presentation, which advises new employees to self-enroll within 31 days of their date of eligibility.  (Def.'s PFOFs (dkt. #36) ¶ 93 (citing Albrecht Decl., Ex. C (dkt. #37-3)).)[7]

Jablonski did not self-enroll in any voluntary fringe benefit programs available to physician employees when he started at BHS.   CNO Cox and Benefits Coordinator Albrecht both aver that Jablonski declined voluntary benefits, and Jablonski acknowledges that he did not enroll in any such benefits, except for short-term disability coverage. Jablonski represents that he filled out an enrollment form for that coverage in November 2018, but that BHS did not enroll him until April 1, 2019.[8]  Regardless, Cox estimated that had Jablonski enrolled in all available voluntary benefits, it would have cost $65,915.74 per year.  For reasons that are not clear, Cox apparently also reasoned that

---

[7] Defendant also points out that some of the benefits provided to physician-employees require a waiting period before an employee becomes eligible.  Specifically, for health, dental and vision insurance, the waiting period is the first of the month 30 days after the hiring date.  For Jablonski, therefore, he would not have been eligible for health insurance until December 1, 2018.

[8] Jablonski's responses as to whether he disputes expressly declining benefits are confusing at best and seemingly contradictory at worst.  At one point, he represents that he wanted benefits all along, pointing to text messages between him and Cox in April 2019 in which he stated that he asked for "enrol[l]ment since the beginning of my employment."  (Mitchel Decl., Ex. 23 (dkt. #44-23) 3.) On the other hand, he avers in his declaration that if he had "received benefit enrollment information, including the proper cost of benefits at the time of his hire and proper information that he did not have to forgo benefits in order to get his full salary, he would have completed the necessary steps to enroll."  (Pl.'s PFOFs (dkt. #49) ¶ 47 (citing Jablonski Decl. (dkt. #50) ¶ 48).) There is no dispute, however, that based on this decision BHS apparently interpreted the Agreement as providing $330,000 in total annual compensation, *including* benefits.

Jablonski's decision to decline benefits meant that his total compensation should be less than the $330,000 promised in his Agreement.

As such, on November 15, 2018, Jablonski was presented with and signed an Amended Agreement, in which he agreed to be paid $265,000 per year, apparently deducting the value of his benefits.  (Mitchell Decl., Ex. 16 (dkt. #44-18) (First Amendment to Employment Agreement).)  In contrast, Jablonski contends that Cox told him that the only way he *would* be eligible for his full salary of $330,000 is if he opted out of all benefits.  (Pl.'s PFOFs (dkt. #49) ¶ 50.)  Moreover, Jablonski also avers that:  he felt he had no choice but to sign the Amended Agreement given his immigration status; and he suffered emotional distress and felt that BHS deprived him of his free will in forcing him to sign the Amended Agreement.[9]  Regardless, based on the terms of this Amended Agreement, Jablonski was subsequently paid for the next five, bi-weekly pay periods at a rate consistent with $265,000 annual compensation, a rate which appears to have been inconsistent with both parties' original intentions.

Fortunately, Jablonski then complained about the reduced compensation, reasoning, logically, that having opted out of benefits, he should receive his full compensation of $330,000 package as salary, which he then could use to secure private health insurance if he wished.  (Mitchell Decl., Ex. 19 (dkt. #44-19) 4-5; *see also* Cox Decl., Ex. B (dkt. #38-2) 6 (Jablonski writing that he "at the beginning of my employment I have

---

[9] Jablonski also purports to cite a doctor's note in support of a finding that he was "shaking . . . visibly upset" and in "emotional distress," but the actual citation is generally to a 209-page document without any pin cite or other way for the court to locate the quoted language, much less confirm that these observations were specifically addressing his reaction to the Amended Agreement and not to his subsequent leave or termination.  (Pl.'s PFOFs (dkt. #49) ¶ 44.)

chosen to opt out of my hospital benefits and have them paid as part of my salary").)[10]
After initially refusing his complaint, BHS ultimately viewed the dispute as an "innocent
misunderstanding" and reset Jablonski's salary from $265,000 to $330,000 and allowed
him to recoup the difference in the previous five weeks between his original and amended
compensation structures over the next three pay periods.  In that way, Jablonski was made
whole, a point he does not dispute.  Still, Jablonski claims that Cox forced him to sign the
Amended Agreement by threatening termination of his employment, and also claims that
her actions were motivated by discrimination on the basis of his national origin.

In addition to adjusting his compensation, BHS also offered Jablonski a second
opportunity to enroll in the same suite of voluntary benefits offered at the outset of his
employment, using a new effective date of February 15, 2019.  BHS represents that it made
this offer because Jablonski now *wanted* those benefits.  With the new effective date,
Jablonski became eligible for health, vision and dental insurance on April 1, 2019.
However, Jablonski again failed to self-enroll, maintaining that while told about these
possible benefits, he was still not given instructions until sometime later that month.

### 2.  Board Eligibility Issues

Once hired, Jablonski could not provide clinical services at NorthPointe as he was
never board certified as an anesthesiologist by the ABA during his employment with BHS
and, therefore, never deemed eligible to obtain proper credentials by SwedishAmerican.

---

[10] Jablonski also avers that he contacted BHS's immigration attorney during this period (1) to ask
whether it was appropriate for BHS to reduce his salary unilaterally and (2) to check if BHS had
made any effort to sponsor his green card.  Jablonski points out that BHS's decision to bump his
salary back up to $330,000 occurred within a week of his conversation with the attorney.

While Jablonski does not dispute this, he claims to have been told that his schedule would be divided equally between NorthPointe and the Hospital.  The parties dispute whether BHS or Stateline employees told Jablonski that they would accept his European medical credentials as a Specialist in the fields of Anesthesiology and Intensive Care -- which he contends is at least equivalent, if not exceeding, the ABA board certification -- *or* for how long they would accept these alternative credentials.  However, there is no dispute that Jablonski *was* told that he must work toward obtaining his ABA board certification.

To obtain board certification, a physician must fulfill several requirements, including examination requirements.  Moreover, the ABA limits the duration that a physician's candidate status may pend.  Specifically, here, for candidates like Jablonski, who completed residency training before January 1, 2012, the ABA imposed a deadline of December 31, 2018, to satisfy all requirements for certification based on that residency. Since Jablonski did not satisfy all requirements by this date, the ABA voided his candidate status.  Still, the ABA permits physicians with voided registrations to submit a new registration to reestablish their candidacy by taking and passing the BASIC examination.[11] Jablonski, however, did not take and pass the BASIC examination during his employment with BHS.

In March 2018, Jablonski acknowledged the impending December 31, 2018, deadline in email correspondence with the ABA.  Moreover, in subsequent communications

---

[11] "The [BASIC] exam focuses on the scientific basis of clinical anesthetic practice, including pharmacology, physiology, anatomy, anesthesia equipment and monitoring," and is the first of three staged exams.   "Exams,"   The American   Board   of   Anesthesiology, https://theaba.org/staged%20exams.html (last viewed April 28, 2022).

with the ABA from March through June 2018, the ABA advised Jablonski that he would not meet the December 31, 2018, and further advised him to take the BASIC examination to reestablish eligibility. After registering to take the exam on June 8-9, 2018, he subsequently canceled his registration. Jablonski again signed up to take the BASIC examination on November 9-10, 2018, but was a "no show." Jablonski claims that he could not take that exam because of his heavy clinical workload and becoming ill with cellulitis.

In a November 30, 2018, email to BHS's physician recruiter Taub, Jablonski represented that he was "[b]oard eligible in the United States," which while technically true, was obviously not the complete story in light of his ongoing communications with the ABA. (Taub Decl., Ex. D (dkt. #42-4) 2.) In response to Taub's follow-up question as to whether he took or was scheduled to take the "US Board Exam," Jablonski stated, "I did not take it, because I was ill. I intend to take it in coming June," referring to June 2019. (*Id.*) Based on this record, BHS maintains that as of January 1, 2019, Jablonski was in violation of his contractual obligations. However, Jablonski maintains that no representative of BHS, including Taub or CNO Cox, *told* him that his lack of ABA board certification was unacceptable or a violation of his employment agreement.

On March 30, 2019, Jablonski again registered to take the BASIC examination. On April 1, 2019, Cox emailed Jablonski to discuss multiple matters, including whether Jablonski had registered to take the BASIC examination to reestablish his board eligibility. In an email the next day, Cox directly asked, "have you registered for your Board Eligibility test?" (Cox Decl., Ex. C (dkt. #38-3) 2.) Jablonski responded, "I do not take any board

13

eligibility exams as I do not need them.  I intend to sit the first among current ABA new standard primary certification exams in the first week of June." (*Id.*)  Jablonski explains that the first sentence was simply meant to convey that he did not need to take any exams before taking the BASIC examination.  Regardless, the parties now dispute whether the second sentence conveyed that he was registered to take the BASIC examination in June 2019.

### 3.  Dispute Over Vacation and Other Absences

Before starting his employment, BHS recruiter Taub communicated to Jablonski that, like all physician-employees at BHS, he would receive four weeks of vacation.  This benefit was also listed on the sheet Taub presented to Jablonski during their October 29 meeting.  However, Jablonski avers that "BHS pledged to me at the beginning of my employment that I would receive six weeks of paid vacation," without identifying *who* at BHS made that commitment.  (Jablonski Decl. (dkt. #50) ¶ 55.)  Jablonski further avers that the Stateline partners agreed to give him an *additional* week of vacation, bringing Jablonski to an understanding that he was entitled to a total of seven weeks of paid vacation.

During phone conversations and their October 29 meeting, Taub further avers that she communicated to Jablonski that because he was employed by BHS, its Chief Nursing Officer *Cox* would be serving as his workplace supervisor.  As such, he was required to request time off from Cox, but should also notify Stateline physicians for the practical purpose of assisting them in creating schedules for anesthesiologists.  While Jablonski acknowledges being told that he was an employee of BHS, he avers that neither Taub nor

anyone else at BHS told him that Cox was his workplace supervisor or that he had to request time off from Cox.  Instead, Jablonski avers that he was not told until April 2019 to request time off from Cox.

As already alluded to above, the parties also dispute the nature of Jablonski's working relationship with Cox more generally, as well as his relationship with two Stateline physicians, Drs. Taher and Tse.  Specifically, defendant BHS contends that Cox was Jablonski's workplace supervisor, with authority to manage all aspects of his employment with BHS, and that neither Taher nor Tse had any employment authority over him. Instead, BHS maintains that Dr. Taher served as a "mentor" or "preceptor" to Jablonski, which role was limited to answering his questions relating to clinical concerns.  In contrast, plaintiff Jablonski avers that he was "managed by and fully integrated into BHS's Anesthesiology Department, led by Dr. Taher and Dr. Tse," and that Dr. Taher was his "first-line manager, mentor, and direct supervisor."  (Jablonski Decl. (dkt. #50) ¶ 25.)

As also described above, Stateline provides anesthesiology services at the Beloit Hospital and the NorthPointe clinic.  For both facilities, therefore, Stateline manages a monthly "call" schedule, with various designations, including vacation/day off.  If an anesthesiologist is not scheduled for a vacation or day off, then that anesthesiologist is on the call schedule to work.  Moreover, Dr. Tse averred in his declaration that Stateline "organizes its monthly 'call' schedule to provide equal distribution of work to all physicians on the schedule."  (Tse Decl. (dkt. #43) ¶ 19.)  Jablonski avers that because he was exclusively assigned to the Hospital, however, he worked longer, and more disruptive, hours than his colleagues assigned to both the Hospital and NorthPointe.

In addition, Jablonski took vacation for the following days in early 2019: January 11-18; January 19-26; March 3-17; and March 31-April 7. Jablonski was also scheduled for vacation from April 22-26. As such, Jablonski had scheduled six weeks of vacation in 2019 -- indeed, in the first four months of 2019 -- which is two more weeks than BHS represents was permitted under its policy, and left him with just one more week for the rest of 2019 even under his claimed entitlement to seven weeks.

Jablonski also did not request (or otherwise inform Cox or anyone else at BHS of his) vacation time before taking it. Instead, Jablonski simply marked his vacation in Stateline's call calendar. Both Drs. Tse and Taher deny ever telling Jablonski that -- and did not intend for -- his marking of vacation days in their calendar satisfied (or otherwise substituted for) any obligation that he had to request vacation through BHS as his employer. In response, Jablonski points to BHS's policy with respect to reporting absences, requiring employees to "notify their Department Director or designee of any absence as soon as possible." In his view, therefore, as the Department's Director, Dr. Taher was the appropriate person for him to report absences. (Mitchell Decl., Ex. 13 (dkt. #44-13).)

In addition to the vacation days, Jablonski did not show up to work between April 8 and April 12, 2019, despite being on the call schedule. Defendant further represents that before his absence on April 8, Jablonski neither informed Cox nor his clinical colleagues, Drs. Taher and Tse, of his planned absence or the reason for it. While plaintiff purports to dispute this failure as well, he only cites to text messages sent to Drs. Tse and Taher *after* failing to report to work on April 8th or 9th. (Mitchell Decl., Exs. 37, 38, 39, 41, 43 (dkt. ##44-37, 44-38, 44-39, 44-41, 44-43).) In fairness, Jablonski also avers that

he called the hospital administrator on duty on the morning of April 8, 2019, to advise the hospital that he was sick, and they would need to arrange coverage in anesthesiology, but this representation appears dubious at best, given his own asserted obligation to inform his *Stateline colleagues* of absences and his unlikely purported method for providing meaningful notice to BHS. Finally, Jablonski represents that he sought medical treatment at BHS's Convenient Care facility, where it was noted that he was "sweaty, nervous, exhausted and generally unwell." (Pl.'s PFOFs (dkt. #49) ¶ 76.)

Regardless, with Jablonski again absent from work on April 9, Dr. Taher felt the need to inform Jablonski's employer, BHS, that he had not shown up to work, so she contacted CNO Cox.[12] In turn, since nobody knew where Jablonski was at that time, Cox conferred with his recruiter Taub and as head of Human Resources ("HR") McCawley, before deciding to request a wellness check by the local police at Jablonski's home. Because Cox could have simply called him, Jablonski avers that he interpreted the police check as threatening and intimidating.

Jablonski still did not show up for work on April 10, although he did convey to Dr. Taher on April 9th that he expected to be out until Thursday, April 11. Even so, Jablonski again failed to communicate his absence on April 10 to Cox or anyone else at BHS. In addition, on both April 10 and 11, Dr. Tse from Stateline checked in with Jablonski via text to learn when he intended to return to work and told him to contact Cox about his absences. On April 11, Jablonski finally texted Cox as follows: "This is to inform you. I

---

[12] Both Drs. Taher and Tse testified at their respective depositions that they expected Jablonski to report absences to BHS as his employer, including his absences in April 2019.

am currently on medical leave of absence until 4.19.19." (Mitchel Decl., Ex. 41 (dkt. #44-41) 3.)  In response, Cox texted Jablonski a copy of the Attendance Policy and asked him to supply a physician note.  On Friday, April 12, Jablonski texted Cox a form signed by a physician indicating that he was not able to work from April 8 until April 19, 2019.  (*Id.*)  The note also provided two diagnoses: obstructive sleep apnea ("OSA") and shortness of breath ("SOB").

On April 12, Cox emailed Jablonski to confirm receipt of the medical note, and informed him that she had learned of his scheduled vacation for the week of April 21, 2019, which was not approved.  Cox further requested that upon his return, he report to HR to discuss various issues, reiterating the requests for information made in her April 1st and 2nd emails regarding his board eligibility status.  Jablonski neither disputes receiving this email nor its contents, but contends that he had properly scheduled his upcoming April 21 vacation because Cox never indicated that he was required to seek her approval.  Having not heard from Jablonski, Cox emailed him again on April 16 to express her hope that his health was improving and to verify that he received her April 12th email.  Later that day, Jablonski replied that he was still ill and could not confirm his return date, but he would keep her informed.

On April 19, Jablonski also texted Tse to tell him that he was "still unwell and unable to return to work next week."  (Mitchell Decl., Ex. 37 (dkt. #44-37) 6.)  Although Jablonski did not convey this same information to Cox, he assumed Tse would share his update.  Having heard nothing herself for almost a week, Cox next emailed Jablonski on April 22, "It has come to my attention that you have not returned to work.  As your

employer, could you please provide me with an update on your health status[?]"  (*Id.*, Ex. 45 (dkt. #44-45).)   Cox also advised that since the last medical note only excused him from work through April 19, he would need to provide an updated medical excuse.

Cox followed up with yet another email on April 23, advising him that he would need to sign up for short-term disability to supply income because he had not been working for over two weeks now, with no communication of his return; and so, he would not be receiving future salary payments.  (*Id.*, Ex. 48 (dkt. #44-48).)  Although he acknowledged receipt of both in his deposition, Jablonski did not respond to either email.  Instead, he waited until April 26 to text Dr. Tse again.  This time, Jablonski notified Tse that he would "need to continue to be off duty for the next week per my doctor's recommendation."  (*Id.*, Ex. 37 (dkt. #44-37) 7.)

Unbeknownst to BHS, Jablonski had actually traveled to Poland (by way of the United Kingdom) from April 15 to April 28, 2019, apparently to seek medical treatment. Jablonski also avers that he was too physically ill during this period to return to work.  On April 30, 2019, at 2:44 p.m., Jablonski further emailed Cox a medical note from a different medical care provider, dated that day, purporting to excuse Jablonski from work between April 19 and May 24, 2019.  (Mitchell Decl., Ex. 49 (dkt. #44-49).)  Jablonski also texted the same note to Cox on May 1 at 3:08 p.m.  Cox avers that she did not see Jablonski's email on April 30, and therefore, she only became aware of the new provider note after receipt of his text message on May 1.  Drs. Tse and Taher also both aver that Jablonski's ongoing absences in April 2019 caused substantial disruption to the anesthesia service line

at the Hospital and caused a substantial burden on other Stateline physicians who had to cover for him.

### 4. Work Schedule Issues

In its H-1B petition seeking to sponsor Jablonski's employment, BHS represented that his work schedule would be "variable -- 32 hours per week" at the Hospital and "variable -- 32 hours per week" at NorthPointe.  (Taub Decl., Ex. B (dkt. #42-2) 27.)  Defendant contends that these hours represented neither maximum nor minimum hours.  More specifically, BHS recruiter Taub avers that she told Jablonski before he started employment that BHS would *not* agree to a 32 hour per week maximum given the nature of his job as a surgical anesthesiologist at an acute care hospital with large patient volume and a "call" schedule format.  (Def.'s Resp. to Pl.'s PFOFs (dkt. #56) ¶ 55.)  Moreover, while Jablonski was told that his time would be divided between BHS and NorthPointe, he was ultimately not permitted to work at NorthPointe because of his lack of ABA board certification.

Regardless, Jablonski now maintains that work at NorthPointe "would have been less likely to overwork or disrupt the sleep . . . because it was a day surgery center with much lower patient volume."  (Pl.'s PFOFs (dkt. #49) ¶ 58.)  As mentioned above, Jablonski also maintains that he ended up working longer and more disruptive hours than his Stateline colleagues.  Jablonski further speculates that BHS exploited his unlimited ability to work because of his status as an H1-B visa employee.  In particular, Jablonski avers that he was frequently required to take night calls then work into the late afternoon the following day, causing stress and fatigue to the point of his getting very sick.  Defendant

purports to dispute this based on Drs. Taher and Tse's testimony that Jablonski was rotated on the call schedule the same as every other physician.  Moreover, defendant points out that Jablonski has *no* evidence that his employer BHS dictated his schedule.

Jablonski also avers that BHS required him to work for 100 hours during the course of a single week in November and December 2018, including at one point working 36 consecutive hours and that the 100 hours consisted of "real clinical work on site at the hospital, and did not include additional on-call time during which Dr. Jablonski was not on site doing clinical work."  (Pl.'s PFOFs (dkt. #49) ¶ 61.)  For defendant's part, Drs. Tse and Taher aver that they have never worked 36 hours straight at the Hospital or 100 hours in a week, although they offer no statement as to whether Jablonski was required to work that much at a time.  In so averring, they point out that when a physician is on a 24-hour "call" period, that does not mean that they are necessarily working; indeed, they may even leave the hospital during that period.  However, it appears no one actually tracked Jablonski's hours, although Jablonski also offers no evidence that *BHS* dictated his hours.

### E. Jablonski's Termination

BHS terminated Jablonski's employment on May 1, 2019, purportedly on the basis that Jablonski violated multiple obligations under the Agreement.  Specifically, in late April, Vice President and CNO Cox shared with Vice President of HR McCawley that Jablonski had not been showing up to work that month *and* failed to report his absences or otherwise respond to Cox's attempts to contact him.  Between April 26 and May 1, Cox, McCawley and BHS's President McKevett discussed Jablonski's ongoing absences and other employment issues, reaching the conclusion that Jablonski's actions resulted in him

failing to satisfy multiple obligations in his Employment Agreement. These violations included: ensuring board eligibility (Sec. 3.1.2) ; complying with System policies regarding call off, scheduling and other rules (3.3.1); complying with directives and instructions (3.3.3); not engaging in conduct that is disruptive and unprofessional (3.3.5); and cooperating with the System's quality of care and other standards (3.5).

At that point, President McKevett avers that he decided to terminate Jablonski. BHS memorialized the reasons for terminating his employment in a letter to Jablonski dated May 1, 2019. The letter was prepared with the assistance of counsel, which was also secured before May 1. McCawley emailed Jablonski the letter at 4:50 p.m. on May 1, and earlier that same day, a hard copy of the letter was mailed to Jablonski's home address. Nevertheless, on the basis that defendant lacks "documentary evidence," Jablonski purports to dispute defendant's representation that the termination decision was made before receipt of his second medical note excusing his continued absences from work for health reasons. (*See, e.g.*, Pl.'s Resp. to Def.'s PFOFs (dkt. #48) ¶ 210.) Jablonski also contends that the proffered reasons for his termination are pretextual.

### F.  Jablonski's Medical Conditions

Before his employment with BHS, Jablonski already suffered from obesity and clinically diagnosed obstructive sleep apnea ("OSA"), having first been diagnosed in 2011. During his employment with BHS, Jablonski also avers that he developed a number of other health conditions, including high blood pressure, diabetes, shortness of breath, insomnia, sleep deprivation, metabolic syndrome, pain syndrome, cellulitis, chronic venous insufficiency, and depression. In support, he again cites to a lengthy medical record, which

22

includes a number of doctor visits that appear to the court to have occurred *after* his employment with BHS.  Regardless, there appears to be no dispute that he suffered from OSA.  In fact, Jablonski's bilevel positive airway pressure ("BiPAP") ventilator machine provided relief for his OSA condition before his employment by BHS, although he represents that it was no longer sufficient to relieve his symptoms due to his irregular sleep schedule and long hours at the Beloit Hospital.

Jablonski also contends that he "arranged multiple meetings with BHS leadership during the winter of 2018-2019 to discuss accommodating his disabling conditions," but that the meetings were canceled and not rescheduled.  (Pl.'s PFOFs (dkt. #49) ¶ 75.) Unlike the many emails, texts and mailings between personal at BHS, Stateline and Jablonski, however, he offers no emails, texts or other correspondence in which he sought such a meeting or evidence that any meetings were scheduled.  BHS also disputes that Jablonski ever asked to discuss any disability or accommodations, pointing out in particular that Jablonski never met or spoke with BHS President McKevett and only met the Vice President in charge of HR, McCawley, once in the hallway.  As for Cox, she appears to have been made aware of Jablonski's obstructive sleep apnea and shortness of breath for the first time in the medical note received on April 12, 2019.  Indeed, the record in this case shows that it was Cox who attempted to meet with Jablonski to discuss various

employment issues on a number of occasions beginning on April 1, 2019, but that he repeatedly rebuffed her requests.[13]

## OPINION

Plaintiff pursues claims for discrimination based on national origin under Title VII, 42 U.S.C. § 2000e-2(a), and for failure to accommodate and unlawful termination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a).  The court will take up each claim in turn.

## I.  Title VII National Origin Claim

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In this case, plaintiff Jablonski contends that his employer BHS discriminated against him on the basis of his national origin, Polish.  Because defendant has moved for summary judgment, the "singular question" for the district court is whether the plaintiff has introduced evidence that would "permit a reasonable factfinder to conclude" that the plaintiff's national origin "caused the discharge or other adverse employment action." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).

---

[13] Defendant proposes facts about Jablonski's pre-employment physical, and more specifically, about key individuals' lack of access or review of his medical file, which includes Jablonski's history of obstructive sleep apnea and shortness of breath.  (Def.'s PFOFs (dkt. #36) ¶¶ 66-77.)  Plaintiff does not dispute the lack of review of his medical file, but disputes a lack of awareness by key individuals in light of his statements to Drs. Tse and Taher in April 2019 that he was ill, and his medical notes.  (Pl.'s Resp. to Def.'s PFOFs (dkt. #48) ¶¶ 72, 76.)  The court discusses the timing of his notice and defendant's knowledge below.

While a plaintiff is free to offer direct or circumstantial evidence of discrimination, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016).  Still, the "familiar" burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), allows "a plaintiff to make a *prima facie* case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020), *reh'g denied* (July 31, 2020).  To establish a prima facie case, a plaintiff must show: (1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another, similarly-situated employee outside of his protected class received better treatment from his employer.  *Marshall v. Ind. Dep't of Corr.*, 973 F.3d 789, 791–92 (7th Cir. 2020).

In his opposition brief, plaintiff first states that he is pursuing his Title VII national origin claim "under the indirect, burden shifting method of proof." (Pl.'s Opp'n (dkt. #47) 36.)  After reciting the four elements as described above and noting that the defendant argued plaintiff could not demonstrate the second or fourth elements of his *prima facie* case, plaintiff fails to identify a single, similarly-situated employee "not in plaintiff's protected class who was treated better." (*Id.*)  From plaintiff's proposed factual findings and his responses to defendant's filings, perhaps plaintiff contends that either Dr. Tse or Dr. Taher (or some other, unidentified anesthesiologist in the Stateline practice) is similarly situated and received better treatment in terms of vacation time or working conditions, but he does

25

not make this argument, nor will the court make it for him. *See Jeffers v. Comm'r of Internal Revenue*, 992 F.3d 649, 653 (7th Cir. 2021) ("We will not scour the record in an attempt to formulate a cogent argument when [a party] has presented none.").

Even if the court were willing to do so, as defendant explains, neither Dr. Tse, nor Dr. Taher, nor *any* of their colleagues, are employees of BHS, and in light of this distinction, plaintiff cannot demonstrate that he is similarly situated to them. *See Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) ("In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") (internal citation and quotation marks omitted).  Moreover, if the court were willing to even look beyond this obvious flaw, plaintiff has still offered no evidence of *any* BHS doctor (or for that matter Stateline anesthesiologist) who so thoroughly dropped the ball in obtaining his board certification promptly, took inordinate amounts of scheduled *and* unscheduled vacation in the first few months of employment, then adopted radio silence when his employer asked for an explanation.

Still, as the court explained above and plaintiff also points out, he need not rely on the indirect method; instead, "a plaintiff should be free to meet his or her initial burden with other kinds of evidence that also may give rise to an inference of discrimination." (Pl.'s Opp'n (dkt. #47) 36 (quoting *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1169 (7th Cir. 1999)).)  As for other evidence, however, plaintiff simply points to defendant's inexplicable blunder in attempting to pay him a lower salary for the first, five weeks of his employment

26

(though later corrected), his *belief* that he was awarded less vacation time than his Stateline colleagues, and his wholly unsupported assertion that he was required to work longer hours because of his status of being on an H1-B visa.  Unfortunately for plaintiff, even assuming that this evidence might form a sufficient basis for a jury to infer discrimination against him, this is *not* evidence of discrimination *because of national origin*.

As the Seventh Circuit explained in *Cortezano v. Salin Bank* & *Tr. Co.*, 680 F.3d 936 (7th Cir. 2012), "[d]iscrimination based on one's status as an immigrant might have been included within the ambit of 'national origin' discrimination, but that is not the path the Supreme Court has taken. The Court instead chose almost [50] years ago to adopt a narrower definition of national origin discrimination for purposes of Title VII."  *Id.* at 940 (citing *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86 (1973)).  In *Espinoza*, the United States Supreme Court concluded that the phrase "national origin" in Title VII referred to "the country from which you or your forbears came."  *Espinoza*, 414 U.S. at 89.  Relying on this definition, the Seventh Circuit concluded that "national origin discrimination as defined in Title VII encompasses discrimination *based on one's ancestry*, but not discrimination based on . . . immigration status."  *Cortezano*, 680 F.3d at 940 (emphasis added); *see also Onyemelukwe v. Caterpillar, Inc.*, No. 18-1119-MMM, 2019 WL 5424954, at *5 (C.D. Ill. Oct. 23, 2019) (concluding that two of the comments defendant made about plaintiff's immigration status did not support a Title VII national origin claims); *Ofoche v. Apogee Med. Grp., Virginia, P.C.*, No. 4:18CV00006, 2018 WL 4512076, at *4 (W.D. Va. Sept. 20, 2018) (holding that claim based on discrimination because of immigration status is not recognized under Title VII, citing *Cortezano*).  Here, plaintiff has not even offered a stray

27

comment, much less actual evidence, upon which a reasonable jury could infer an animus by anyone associated with BHS because the plaintiff is Polish; and he has certainly produced *no* evidence that anyone with authority to terminate him at BHS did so because of his national origin.  On the contrary, the evidence that BHS acted for reasons wholly unrelated to his Polish descent is overwhelming.[14]   Accordingly, the court will grant defendant's motion for summary judgment on plaintiff's Title VII claim.

## II. ADA Failure to Accommodate Claim

Plaintiff also asserts two ADA claims.  First, he alleges that defendant violated the ADA by failing to provide him with an accommodation.  To succeed on this claim, plaintiff must prove that: (1) he is a qualified individual with a disability; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability.  *See James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013).  Taking the elements out of order, defendant initially argues that plaintiff cannot show that BHS knew he suffered from a disability.  The undisputed record establishes that BHS was on notice by April 12, 2019, at the earliest, that Jablonski suffered from a diagnosis of obstructive sleep apnea and shortness of breath.  However, there is nothing in the record to support a finding that its Vice President in charge of supervising Jablonski's employment Cox *or* any other key stakeholder at BHS, nor even his Stateline colleagues, were aware of these

---

[14] Indeed, defendant offers several other bases for summary judgment in its favor, including that: plaintiff he wasn't meeting his legitimate, contractual expectations and BHS had legitimate, non-discriminatory reasons for terminating his employment.  However, the court need not reach these arguments, despite their obvious merit, having concluded that plaintiff's only evidence of discrimination does not support a finding, as a matter of law, of discrimination on the basis of national origin.

medical conditions *before* April 12.  Instead, as of April 9, Cox and Drs. Tse and Taher simply knew that Jablonski reported not feeling well, and before that date, there is no indication that Cox, other individuals at BHS, nor his Stateline colleagues were aware of any diagnosed medical condition or disability.

Even crediting that plaintiff's OSA might satisfy the definition of disability under 42 U.S.C. § 12102, because it interferes with one or more major life activities (namely, sleep and work), plaintiff's failure to accommodate claim necessarily concerns *only* the time period from April 12 to the termination of his employment on May 1, 2019.  Further, it only concerns accommodations requested for his OSA, and perhaps, shortness of breath, to the extent that can be viewed as independent from his OSA.[15]  In other words, to the extent plaintiff requested *either* additional vacation time or modifications to his work schedule before April 12, there is a limited basis for a reasonable jury to infer that he made those requests to accommodate his disability and *no* basis that defendant was aware or had reason to know that Jablonski made those requests to accommodate his disability.

Defendant next seeks summary judgment on plaintiff's ADA accommodation claim on the basis that he was not a "qualified individual."  Defendant posits two challenges to this requirement.  First, defendant contends that plaintiff was neither qualified because he was not ABA certified, nor diligent in his efforts to become ABA certified.  With respect to this argument, plaintiff has raised a genuine issue of material fact as to whether his lack of

---

[15] Based on the court's review of the medical record, plaintiff's mental health may also have been a significant barrier to his ability to work during the relevant time period, or at least as significant as his OSA, but plaintiff does not contend that he was disabled on this basis.  Regardless, there is *nothing* in this record to support a finding that BHS was aware of any mental health concerns.

certification as of January 1, 2019, rendered him unqualified, especially given that he was still practicing as an anesthesiologist at the Hospital after January 1, 2019. If this case were to proceed to trial, a jury would have to sort out conflicting facts to determine whether his lack of ABA certification in April 2019 or his failure to act promptly in securing certification rendered him unqualified, but this is not a basis to grant summary judgment to defendant.

Second, defendant argues that plaintiff was not qualified because he was unable to work at all for the period of time material to his failure to accommodate claim. This argument has significantly more traction in light of recent Seventh Circuit precedent discussing the scope of protection of an ADA claim compared to the protections under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* In *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476 (7th Cir. 2017), the Seventh Circuit concluded that "[a]n employee who needs long-term medical leave *cannot* work and thus is not a 'qualified individual' under the ADA." *Id.* at 479 (citing *Bryne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003)). The plaintiff in *Severson* had apparently requested an additional, two months of leave commencing on the last day of his approved 12-week FMLA leave to recover from disc compression surgery. *Id.* at 479. In considering the qualified individual requirement in conjunction with the contours of a reasonable accommodation, the Seventh Circuit affirmed the district court's entry of summary judgment in defendant's favor, reasoning that even though the ADA contemplated "job restructuring, part-time or modified work schedules" as possible "reasonable accommodations," a complete inability to work "is not a means to perform the job's essential functions," and as such, a proposed

30

accommodation that does not make it possible for an employee to perform his job means that the employee is not a "qualified individual," at least as that term is defined under the ADA. *Id.* at 481. Still, as the Seventh Circuit also recognized in *Bryne,* "a brief period of leave," in particular to address intermittent conditions, may be appropriate. *Id.* (citing *Bryne,* 328 F.3d at 381). In contrast, the plaintiff in *Severson* was requesting a "multimonth leave," which the court concluded was "beyond the scope of a reasonable accommodation under the ADA." *Id.* at 479; *see also Taylor-Novotny v. Health Alliance Medical Plans, Inc.,* 772 F.3d 478, 489-90 (7th Cir. 2014) ("A plaintiff whose disability prevents her from coming to work regularly cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes." (internal citation and quotation marks omitted)).

Here, plaintiff was apparently requesting a leave from April 8 through at least May 24, 2019, after having taken vacation for the week before his claimed medical leave request (from March 31 to April 7), not to mention an additional, four weeks of undisputed vacation time Jablonski had taken since the beginning of 2019. As such, Jablonski was requesting to miss almost two months of work from March 31 to May 24, 2019. Accordingly, on this record, *Severson* arguably forecloses plaintiff's ADA claim.

Even if *Severson* does not foreclose plaintiff's claim, defendant finally contends that summary judgment is warranted because plaintiff has failed to put forth sufficient evidence from which a reasonable jury could infer either that BHS refused to engage in an interactive process *or* that Jablonski suggested a reasonable accommodation that BHS rejected. Specifically, viewing his accommodation claim most generally, plaintiff is contending that

his reasonable accommodations were for additional vacation time and reasonable hours, and further contends that had those accommodations been granted, he would have been able to return to work.

However, plaintiff fails to put forth any evidence that he requested either of these modifications *after* defendant BHS was made aware of his disability.  *See Taylor-Novotny*, 772 F.3d at 494 (explaining that "the language of the ADA itself demonstrate that a reasonable accommodation is connected to what the *employer knows* about the *specific limitations* affecting an employee who is a qualified individual with a disability" (internal citation and quotation marks omitted)).  Instead, plaintiff simply avers generally that he "arranged multiple meetings with BHS leadership during the winter of 2018-2019 to discuss accommodating his disabling conditions," but that the meetings were "canceled and not rescheduled."  (Pl.'s PFOFs (dkt. #49) ¶ 75 (citing Jablonski Decl. (dkt. #50) ¶ 24).)  In reviewing the actual evidence plaintiff cites, however, it does *not* begin to support a finding that he was seeking meetings with BHS individuals to address his sleep apnea before he took leave in April 2019.  (Jablonski Dep. (dkt. #28) 37 (asserting that his health conditions were a "private thing," and he only told BHS about his health conditions as they were deteriorating).)  Moreover, to the extent he was seeking schedule modifications, he was seeking them from his Stateline colleagues, without *any* mention that these modifications were necessary to accommodate a disability.  (Mitchel Decl., Ex. 37 (dkt.

#44-37) (December 3, 2018, text to Dr. Tse requesting modified hours, additional vacation time and time off for professional continuing development).)[16]

On this record, therefore, there is simply no basis for a reasonable jury to conclude that Jablonski was either "a qualified individual" *or* requested a reasonable accommodation that his employer BHS refused to provide or refused to engage in an interactive process to address. Accordingly, the court agrees with defendant that summary judgment is warranted on plaintiff's failure to accommodate claim.[17]

## III. ADA Unlawful Termination

The court's finding that plaintiff was not a "qualified individual with or without a disability" under the ADA forecloses his second, ADA claim for unlawful termination as well. *See Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503-04 (7th Cir. 2017) (describing elements of ADA unlawful termination claim, including that plaintiff is "otherwise qualified to perform the essential functions of the job with or without reasonable accommodation"). Even assuming that plaintiff satisfies the "qualified individual" requirement, plaintiff's evidence falls far short of demonstrating that his disability was the

---

[16] In addition, the record reflects that plaintiff effectively *received* the accommodation he sought. As explained above, for the roughly twelve-week period from January 1 through March 31, 2019, plaintiff took *four* weeks of vacation. In effect, therefore, plaintiff received the very accommodation he contends at summary judgment he requested and was denied.

[17] As an aside, plaintiff's claim would typically fall within the scope of the FMLA, but he was not entitled to the protections of that Act given that he only worked for BHS for approximately five months before he requested a medical leave. *See* 29 U.S.C. § 2611 (defining an "eligible employee" under the FMLA as one "who has been employed . . . for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title"). The court also notes that while plaintiff attempts to rely on Dr. Taher's six-week leave after the birth of her child to argue that his leave request was also reasonable, he fails to recognize that her leave likely fell within the FMLA.

"but for" cause of his termination.  *See id.* ("To establish the third prong and survive summary judgment, a plaintiff must show a genuine issue of material fact exists regarding whether his disability was the 'but for' reason for the adverse action, in this case termination.").

As described in detail above, plaintiff utterly failed to keep his employer BHS, and in particular immediate supervisor Cox, apprised of his need to miss work, despite her extraordinary ongoing efforts to stay informed as to what was happening.  Even if a reasonable jury were willing to credit plaintiff's representations that he did not know that Cox was his supervisor, and more critically for purposes of summary judgment, that he was *required* to request leave from Cox until April 2019, the record shows that he was certainly notified of this obligation by April 9, 2019.  Despite this, plaintiff ignored her multiple, follow-up communications and otherwise failed to comply with this requirement.  Indeed, he actually left the country for a significant portion of his late April medical leave, without communicating this to Cox or anyone else in authority at BHS or Stateline.  Indeed, the evidence is nearly overwhelming that plaintiff had affirmatively decided to freeze out Cox and BHS (and to an only slightly lesser degree Drs. Tse and Taher at Stateline, except by cryptic, self-serving electronic messages) while he travelled to Poland for reasons he has never fully explained.

Finally, even if one could argue that plaintiff raised a genuine issue of material fact as to whether Cox or others at BHS were aware of his additional request for medical leave, submitted on the same day, April 30, 2019, at the same time he was being terminated, this fact does not form a basis for a reasonable jury to conclude that he was terminated *because*

*of his disability*.  Instead, the record reflects that BHS terminated his employment because of his failure to keep his employer abreast of his ability to work and need for leave.  *See Taylor-Novotny*, 772 F.3d at 491 (affirming grant of summary judgment in defendant's favor where the record reflected that defendant "was not satisfied with Ms. Tailor-Novotny's continued failures to arrive to work on time without notifying her supervisor).  As such, the court must also grant summary judgment to defendant on this claim, finding that he failed to demonstrate that he was a qualified individual and failed to put forth sufficient evidence from which a reasonable jury could conclude that he was terminated because of his disability.

ORDER

IT IS ORDERED that:

1)  Defendant Beloit Health System Inc.'s partial motion to dismiss (dkt. #7) is DENIED.

2)  Defendant's motion for summary judgment (dkt. #34) is GRANTED.

3)  The clerk's office is directed to enter judgment in defendant's favor and close this case.

Entered this 28th day of April, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

35